W. C. HALL, Administrator, Appellee, v. CHICAGO, ROCK ISLAND & PACIFIC RAILROAD COMPANY, Appellant.

**EVIDENCE:** Opinion Evidence—Examination of Expert—Absence of
1    Fact Basis. Reversible error results from allowing answers to hypothetical questions which are in a material way without fact foundation in the record.

**NEGLIGENCE:** Proximate Cause—Equal Probabilities. No recovery
2    may be had in an action based on negligence when the evidence is equally as consistent with a theory of *no* negligence as *with* negligence.

**TRIAL: Waiver of Exceptions.** Counsel who is overruled in his in-
sistent claim that defendant has not made a jury case may then
adapt himself to the erroneous position of the court and, by re-.
quested instructions, seek, as far as possible, to minimize such
erroneous position on the part of the court; and by so doing he does
not waive his exceptions.

Headnote 1: 22 C. J. p. 714; 26 Cyc. p. 1470. Headnote 2: 29 Cyc.
p. 625. Headnote 3: 38 Cyc. p. 1933 (1926 Anno.)

*Appeal from Louisa District Court.*—OSCAR HALE, Judge.

JUNE 24, 1924;

REHEARING DENIED FEBRUARY 20, 1925.

ACTION brought under the Federal Employers' Liability
Act, to recover damages on account of the death of plaintiff's
decedent, who was employed by the defendant as a switchman in
its yards at Cedar Rapids, Iowa. Trial to a jury. Verdict and
judgment for plaintiff for $10,000. Defendant appeals.—*Re-
versed.*

*H. O. Weaver, J. G. Gamble,* and *A. B. Howland,* for appel-
lant.

*Molsberry & Reaney* and *Arthur Springer,* for appellee.

PRESTON, J.—Plaintiff alleged that, at about 1 o'clock on
the morning of March 9, 1921, decedent, Buffington, rode a
string of cars which were being switched in defendant's yards,
and in the performance of his duties traveled south over and
upon a car upon which he had set the brake, and another car;
that, when Buffington reached the south end of the second car,
the defendant negligently switched other cars with great force
and speed in and upon the switch track, and caused the cars to
come in contact with such violence as to throw the said Buffing-
ton from the car, and his body was run over by the cars, and
said Buffington was killed. It was also alleged that the cars
that came in contact with the one upon which deceased was
riding were not under the control of any of defendant's em-
ployees, at the time deceased was thrown upon the tracks and

under the wheels. Other grounds of negligence were charged in regard to the condition of the running board and the track. Plaintiff also pleaded an ordinance of the city of Cedar Rapids. The trial court withdrew from the jury all claims of negligence except the first two. Defendant denied generally, and pleaded assumption of risk and contributory negligence.

Though the petition alleges that deceased was thrown from the second car, the evidence shows that he was run over by the fourth car in the string of seven, and that in some manner he fell or was thrown between the third car from the north and the fourth car. This is practically conceded.

The errors assigned relate to the sufficiency of the evidence to show negligence and causal relation between the acts charged and the injury, rulings on evidence, instructions, misconduct of counsel in argument, and other matters.

Deceased was about 28 years of age, and was an experienced railroad switchman. He had been employed as a brakeman and switchman at Cedar Rapids for 8 years, 5 of which were continuously for the defendant in its yards at Cedar Rapids. The switching was being done, at the time of the accident, in the same way it had been done during his employment. The night of the accident, he went to work about 8 o'clock P. M. The crew lunched, a short time before the accident, when Sheldon, who had charge of the switching, told the crew the moves they were going to make. He thinks it was about ten minutes from the time deceased was sent to perform this duty of setting the brakes that he saw him dead. Deceased was informed by the foreman of the moves that the engine would make. The accident happened shortly after midnight. The night was dark. It had been raining, or misting, was cold and sleety, and there was no moon. Deceased had a lantern. The switch tracks extended practically, though not quite, north and south, and are numbered from the main line towards the east. This plat shows the situation better than it can be described. The plat here set out is only about half of the blue print, north and south. The blue print shows the tracks extended still farther north or northeast, about as far as, or perhaps a little farther than, the portion we insert.

Track No. 6, where deceased was killed, is shown in red upon the blue print. We have marked it with a cross. Track No. 5 is to the west. We deem it necessary to set out the evidence carefully, and with some detail. Deceased was working in a switch crew under the direction of Sheldon, switch foreman, who was in charge. Switching operations are handled by signals. In switching in the yards, the foreman throws the switches and gives the signals to the engineer. He notifies the man who is following the engine, and the field man, of the cuts of cars to be made. The cars are cut off by the member of the crew whose work is described as following the engine. When the cars are

moved in upon the tracks, the man following the engine takes his place, lifts the pin, and uncouples the cars which are to go in on that track. When the car is uncoupled, the engineer stops the engine, upon signal from the foreman. The operation is described as straight switching. They were not making flying switches that night. Deceased was working as the field man that night. It was his duty to release and set brakes where necessary. Deceased had full charge of the cars when they left the engine, and it was for him to say how far they should be allowed to run, and where and when they should be stopped, and to set one or two brakes, to prevent the cars from being shoved off the track. The track was slightly down grade towards the north for some distance from the switch, and then practically level. Track No. 6 would hold about 15 cars, with space to clear at each end. At about 12:10 A. M., the switch crew picked up 12 cars from the Milwaukee transfer track, and brought them to the Rock Island yard. The engine was at the south end of the string of cars. The cars were to be distributed to the defendant's yard tracks. The first move made by the engine after bringing in the twelve cars was to shove two cars in on No. 6 track. Deceased mounted the cars some place south of where witness Kennedy was engaged in inspecting cars on Track No. 5, and rode the north car of this first cut. He was last seen by Kennedy. Kennedy is the only one who saw anything of the transaction after these two cars were kicked in on No. 6, and, as we understand the record, was about 400 feet or more south, and near the south end of Track 5, when he saw the lantern of deceased fall. Witness does not know whether this was north or south of the coal chute. It is about 815 feet from the south end of Track 6 to the coal chute. From the blue print and the scale, Track No. 6 and the other tracks extend approximately the same distance farther north, on beyond the coal chute, as they do south. Kennedy was used as a witness for plaintiff, and was not in the employ of defendant at the time of the trial. When deceased passed Kennedy, he was in the act of setting the brake on the north end of the north car on Track 6. The two cars had been detached from the engine, and were moving north. As deceased passed Kennedy, he called to "look out;" that they were going to kick some cars in on No. 5. After the two cars were

switched in on Track 6, the crew sent in one car on Track 5; then two more cars were sent in on No. 6. Another car was then put in on Track 5, and then three on No. 6; in all, seven cars on that track. They were running pretty close together; hard to say how much time there was between. There were possibly three or four minutes between the time the first two cars went in until the next two cars went in on No. 6, and approximately the same time between the second and third cut on No. 6. The first car to the north was a Rock Island empty stock car. The six other cars were box cars. Some of them were loaded. The fourth or middle car was a New York Central new steel freight car. Being new, it would run harder, and act as additional brake. A brake does not hold as well when it is wet. Loaded cars have more momentum than empty. Blood was found on the wheels of this steel car and the three cars south of it, but none on the three north, indicating that deceased went down between the fourth one and the one north of it. An examination was made a few hours after the accident, after the cars had been so marked as that they would not be moved. The body was a little northwest of the coal chute; the head between the rails; feet to the west, outside the west rail. The body was severed.

The foregoing facts are testified to by different witnesses, some of them members of the crew, who were called by plaintiff. Some of the foregoing facts were testified to by Kennedy, who also testified substantially:

"After deceased passed me, I next saw him lying on the rail dead. Other cars were sent in on No. 6 after he passed me. Didn't notice particularly whether they were all in one cut or whether there was a vacancy in between. Can't say how far apart they were. Heard an impact where I was when the cars struck; don't think I heard more than one. When they struck, or just before they struck, I noticed the light fall on the ground. It appeared to me about five feet from the ground, where I stood, and it was going towards the ground. Don't know whether it was north or south of the coal chute. I waited a minute or two, to see if he would go after the lantern, and then I started to walk down that way. The light was out; couldn't see anything then. The body had been rolled about 30 feet north of

where the lantern lay, and about 40 feet south of the south end of the south car. I didn't get the length of the cars; think there was one long one in the seven. Auto and furniture cars run 50 feet long. Distance between the cars when coupled varies. Never made any measurements between two ordinary freight cars when coupled. I have seen switchmen step over when the cars were in motion. As a rule, they don't have to jump over. The cars are close enough together, when they are coupled up, so a man can walk right on from one car to another. The running board projects a little. I examined the car at the north end of the string, after he was killed, to see whether the brake was set. Took hold of the brake wheel; didn't let the brake off. Couldn't tell how heavy the brake was set, because I didn't try to throw it up another notch; left it as I found it. How far a car would run would depend upon the condition of the brake and how tight it was set. As far as I could see, it seemed to be set ordinarily tight. Never made any tests to determine how far a car will run under those circumstances, when another car is shoved in on the track where the car is standing with the brake set. I have worked around switch yards for 20 years, and have seen cars switched against other cars a good many times. Moving or switching the cars is out of my line; I am not a switchman; my entire work consists of inspecting the condition of the cars. Haven't had any occasion or any experience to determine how far a car with the brake set, with other cars shoved down on it, will move. I had no experience in moving cars myself. I had had occasion to observe cars being switched in the Cedar Rapids yards for a long time, and on Track No. 6. I don't know how far cars would move. Made no measurements. Imagine could set the brake tighter when the car was in motion. Did not observe how far the two north cars went to the north. Paid no particular attention to deceased or the cars he was on. When he went by me, I was facing to the east or south in the general direction of the coal chute. Didn't turn around and watch the cars or deceased after they passed me. Didn't pay any particular attention to the cars that came in there afterwards. Don't know whether there was one cut or two came in. Nothing about the way the cars went in that called my attention to them. When cars come together, they make some noise. I heard only

one impact. I was between Tracks 5 and 6 until after the accident. Didn't hear any hard impacts of the cars. I heard when the cars came together, of course; always can; it is natural. Didn't hear anything unusual. They always make some noise when they come together. Didn't see anything of deceased on top of any of the cars or coming down the side. I left about 7:30 A. M. I couldn't find anything to tell how Buffington came to get in the position that he did; nothing to indicate whether he fell between the cars or in any other way. The cars had run over him when I got to the body, and the blood was very visible about the rails there.''

During the examination of this witness, he was asked:

''Q. Now, I will ask you whether or not, if a brake was set upon a car in the manner that this one was set upon this car, and five cars were switched in against it in two cuts, how far ordinarily, if at all, they would kick or roll the cars upon which the brakes were set. (Objection: Opinion, conclusion, speculative, immaterial, witness not shown himself competent; assumes the existence of facts not shown by the record, and the facts are not in accordance with the question; conditions are not shown; invades the province of the court and jury.) A. Possibly three car length.''

Sheldon, a witness for plaintiff, employee of defendant, who had charge of the switching at this time, testified to some of the matters before set out, and in addition that ''cars generally run from 50 to 36 feet long; some stock cars, around 38. When Kennedy came running up is when I first learned of the death. Afterwards looked at the cars. Fourth car from the north was the first car that had any blood on. Cars were clear of his body. South end of the south car was 40 or 50 feet north of the body. The brake chain might be tight, and the brakes not set. The switchmen sometimes carry a brake club, to get more purchase. Don't think deceased had any club or stick that night. When the cars are coupled together, there is two or three feet between the cars. Did not measure the distance the hat, lantern, and mittens were from the south end of the car. Couldn't say how far deceased rode the cars in. Track No. 6 is not rough. We could have taken this engine and taken the cars down to wherever wanted, and not detached them from the engine. In

that way the engineer could have stopped his engine, and that would have stopped all the cars. We do not handle these cars in that way because that isn't the way we handle cars; it is customary to do it the other way. It would be easier and quicker for all concerned to handle them as we did. It is the usual method in Cedar Rapids. That is the way they had always been handled by deceased.''

The yardmaster at Cedar Rapids describes the method of switching, and says further:

''It is common practice for switchmen to jump from the top of one car to another, if they have ridden a cut of cars in, and they sometimes jump from one track to another when the cars are being switched, to catch the cars that are coming down on the track. They wouldn't do it, of course, if they couldn't see the other cars coming.''

There is evidence that one brake in good order and properly set would ordinarily hold seven cars. Witnesses testify as to the distance between the ends of cars. The evidence is that it is about three feet, although some witnesses put it a little less than that, and some more. Knott testifies substantially:

''Live at Columbus Junction, and am in the insurance business at present. Worked for railroads for about eight years: station work, switching cars, and inspecting. Quit railroading in 1907, but worked for a railroad in Council Bluffs in 1917. Last employed in railroad work in 1919.''

''Q. Suppose two cars, the first being switched in on the switch track, and the brake on the end of one of these cars set by the switchman riding this car, to prevent the cars from being pushed on down or off the switch track by other cars that might be switched against them; and afterwards two cuts of cars, the first cut containing two cars, and the second, three, should be switched against the first two cars with such momentum as to move the seven cars a distance of 223 feet,—what would you say as to the amount of force that had been expended in putting these cars in there? (Objected to as before, and as incompetent, immaterial, not a proper hypothetical question, in that it assumes conditions not shown by the evidence, and is not a proper hypothetical question upon the facts as they are shown in the record at the present time. Overruled.

Exception.) A. Well, I would say it was of unusual force, on account of moving the cars that distance with the brakes set on them. (Motion to exclude overruled.) Q. Now suppose these cars had dragged a man's body a distance of thirty feet, what would that indicate to your mind as to whether or not the cars with the brakes set had been violently hit, or otherwise? (Same objection and ruling.) A. Well, I would say there was some momentum there, to run over a body or drag a body thirty feet; that would have a tendency to increase the brake. (Motion to exclude overruled.) Q. Now, Mr. Knott, as a railroad man who has had experience in switching cars, and in setting brakes, if the cars came in with a force sufficient to move the standing cars 223 feet, what effect would it have— how would the cars move? A. They would move with a jerk; tendency to jump up, buckle, jump. Q. Now, when railroad men engaged in switching can see cars coming with such force as to cause them to buck, what do they usually do to avoid an injury, if anything? (Objection. Overruled.) A. Well, it depends on the tracks. If you have a track near by, you can jump from one where the cars are, over to where the cars are standing still, before the impact comes. If you can't, you can jump in the air when the car strikes, and take the shock off. To do that, you would have to see them coming. Down grade, as here, would make no difference in my answer, because the impact would have to be there to move the cars, anyway.''

Witness Kulp testifies:

."Reside at Columbus City; work in a hardware store; worked for the Rock Island railroad as brakeman from 1907 to 1914.''

''Q. Now I will ask you, have you ever had occasion to observe how far a car will run, if the brakes are set on it, after other cars have been switched in against it? A. It would make some difference in— Q. Have you ever had occasion to observe that? A. Never noticed,— Q. While you were railroading? A. Not in particular. I never noticed it. I have seen one car switched against another, and have handled cars that were being switched that way. I have handled cars in the switch yard where they were pushed in or kicked in. Q. I ask you as a practical railroad man. Suppose that two cars should

first be switched in on the sidetrack, and the brake on the end of one of these cars set by the switchman riding these cars, to prevent the cars from being pushed on down or off the side-track by other cars that might be switched against them, and afterwards two cuts of cars, the first cut containing two cars, and the second cut three cars, should be switched against the first two cars with such momentum as to move the seven cars 223 feet, what would you say as to whether that was usual or ordinary handling, or not? (Appropriate objection. Over-ruled. Exception.) A. It looks to me like it would be a little rough handling, to kick them that far. (Motion to exclude. Overruled. Exception.) The distance that the cars would be pushed or kicked would depend a whole lot on how tight the brake was set. If the brake was set very tight, I wouldn't think they would go so far. If the cars are coming in fast, it makes more jar; if moving slowly, there isn't hardly any jar at all. By observing the movement of the engine and the sound, you can tell to a degree the force that is being exerted in shov-ing cars. Cars coming against another with the brake set, it is not usual or ordinary that they move very far; they ain't supposed to be.''

Doyle, the yard switchman at the time, cut off the first two cars; describes it; says they were sent in slowly.

''Don't know how close together the two cuts went in. The cars that had run over deceased were opposite the coal chute; couldn't say how far from it. There was nothing different in the movement of the cars that night than at other times,— nothing out of the ordinary. Couldn't say how far down the tracks you could see; it was dark.''

Other witnesses testified for plaintiff and defendant on these and other issues in the case. The foregoing fairly and sufficiently sets out the evidence, for the purposes of the case.

1. One of the important, and as we think the decisive, point in the case is whether there was such rough handling and excessive impact of the cars, by reason of excessive force used,

1. EVIDENCE: opinion evi-dence: exam-ination of ex-pert: absence of fact basis.   or because the cars were not in charge of and under control, as to throw deceased from the car; whether negligence has been proved, so as to make a jury question. It is contended by

appellee that this has been shown circumstantially, and by the expert testimony. On the other hand, it is contended by appellant that there is no evidence to so show, and that there is no basis in the evidence upon which to base the hypothetical questions, and that they were improper. We think the appellant's exception at this point must be sustained. Noticing some of the objections to the questions, two or three may be noticed, which may be thought to be less important than others.

Conceding, for the purpose of the argument, that proper foundations were laid as to the competency of the expert witnesses (though it is doubtful as to some of them), let us examine the questions. The question propounded to Kennedy assumes—and, as we think, without proof—that five cars were switched in against the north two, upon which the brake was set. The latter part of the question assumes that other cars had the brakes set. The language is: ''How far * * * they would kick or roll the cars upon which the brakes were set?'' There is no evidence that any other cars had the brakes set. This last observation is not as noticeable in the evidence of this witness as in some of the others. One of Knott's answers is that he would say it was of unusual force, on account of moving the cars that distance with the brakes set on them. Another question propounded to Knott was, what it would indicate, whether or not the *cars* with the *brakes* set had been violently hit. The hypothetical question to Knott assumes that the second and third cut of cars were switched against the first two with such momentum as to move the seven cars a distance of 223 feet. Counsel for appellee, in argument, arrives at the 223 feet he claims the seven cars moved, which includes the one farthest north, with the brake set, in this manner:

''To show the distance the car moved, and with what force. they must have come together to move so far, it was shown that four cars, at least 36 feet long, passed over the body,—144 feet. Counting from the north, total distance between cars 4 and 5, 5 and 6, 6 and 7, was 9 feet. Body dragged by cars at least 30 feet. Cars passed beyond the body, so that the south end of the south car was north of the body at least 40 feet. Total distance the cars were bumped, 223 feet.''

Necessarily, there would be some shock, and properly so,

when cars come together. The theory of the trial was, and the theory of the hypothetical questions was, that the impact was excessive, and that this is shown by the claim that the entire seven cars, including the one at the north end, with the brake set, traveled 223 feet. There is no claim anywhere, outside of this hypothesis, that there was negligence in the south three cars' striking the second two that were kicked in. There is no claim that brakes were set on the second two or the last three. The last three, striking the second two without any brakes, might move the south five 223 feet. There is no evidence, circumstantial or expert, to show that this would be an unusual distance for the south five or the south three to go without brakes. Doubtless the evidence would be sufficient to show that the three south cars, and possibly the south five, moved 223 feet. But that does not prove that the two north cars, on one of which the brake was set, and the entire seven, moved 223 feet. We do not find in the record any evidence that the north car, upon which the brake was set, was moved at all. There is nothing to show that the second two cars reached the two at the north. The witness who was nearest the vicinity heard only one impact, and he says there was nothing unusual in that,—no hard impact. Necessarily, if the seven cars had come together, there would have been an impact between the two north cars and the two next south. No witness locates the place where the north car was stopped by the deceased with reference to the next two south, or the south three. All the witnesses who testify on the subject say that they do not know how far north the first two cars went before they were stopped by deceased. They could not tell whether the two north cars were stopped north or south of the coal chute. For aught that appears, they could have been allowed to run well to the north end of the tracks, and this was, according to the plat and scale, 700 or 800 feet north of the coal chute. Whether there was a short or long space between the two north cars and the next two, or whether they came together at all, is not shown. It is not shown how deceased got from the top of the two north cars to the top of the second two, and to the south end of the north three cars, where he was evidently thrown off, or fell. Whether he descended from the first two and climbed up on the others, or waited for the second

two to come up, if they did, and stepped across, is wholly a matter of conjecture. The entire basis for the hypothetical question falls when plaintiff failed to show the location of the 'north car, upon which the brake was set, or that the other cars came in contact with the two north cars.' Without referring again to all the circumstances bearing upon this question, we are of opinion that plaintiff failed to show by any evidence even tending to show that the force applied was so unusual as to move the seven cars, with the brake set on the north one, a distance of 223 feet, and that thereby the defendant was negligent. There is no negligence shown. There was no basis for the hypothetical questions. The trial court erred in permitting answers thereto, and in submitting the case to the jury, under the evidence introduced on this trial. Cases are cited pro and con on the subject, but it is so clearly a question of the lack of evidence that it is unnecessary to cite them.

2.  There must be causal relation between the negligence, if shown, and the injury or death. How did this unfortunate man meet his untimely death? If it had been shown that there was excessive force and an unusual impact, did that have anything to do with his death, under the evidence in this record? It has been already mentioned that it is a matter of conjecture as to how deceased arrived at the top of and at the south end of the third car from the north. Witnesses testified, without objection, that there was nothing to indicate how he came to be at the place where his body was found. Whether deceased was thrown from the top of the car by a bumping of the cars together, or whether he had descended from the first string of cars and was ascending the second string, and fell, or whether he slipped because of the wet and sleety conditions, or whether he was stepping across from the third to the fourth car, or whether he jumped as the impact came, to avoid the shock, or whether he fell, or was thrown in some other way, are matters of conjecture. In a sense, we have a question of proximate cause; and yet it is more, we think, a question of causal relation.

2. NEGLIGENCE: proximate cause: equal probabilities.

Appellee contends that the rule is this: Even in a case depending on circumstantial evidence alone to establish negligence, the plaintiff is not bound to negative every other con-

ceivable theory or hypothesis which ingenuity may invent, to account for his injury. It is only when opposing theories are equally reasonable and equally consistent with the proved facts, that plaintiff must fail, as a matter of law. On this proposition, they cite *Gordon v. Chicago, R. I. & P. R. Co.*, 146 Iowa 588; *Paulson v. Bettendorf Axle Co.*, 146 Iowa 399, 403; *Huggard v. Glucose Sugar Refining Co.*, 132 Iowa 724; *Brownfield v. Chicago, R. I. & P. R. Co.*, 107 Iowa 254; *Lehman v. Minneapolis & St. L. R. Co.*, 153 Iowa 118; *McGee v. Jones County*, 161 Iowa 296; *Lunde v. Cudahy Pkg. Co.*, 139 Iowa 688; *Breen v. Iowa Cent. R. Co.*, 163 Iowa 264; *Avise v. Interurban R. Co.*, 174 Iowa 592; *George v. Iowa & S. W. R. Co.*, 183 Iowa 994; *Woodard v. Chicago, R. I. & P. R. Co.*, 193 Iowa 516; *Sever v. Minneapolis & St. L. R. Co.*, 156 Iowa 664. We shall not stop to review the facts in each of the cases, but concede the rule practically as stated. Some of the cases put it this way: that the rule should never be extended so as to result in a failure of justice, where there is room for balancing the *probabilities*, and for drawing reasonable inferences *better supported* upon one side than the other. *Swaim v. Chicago, R. I. & P. R. Co.*, 187 Iowa 466, 473; *Duncan v. Fort Dodge Gas & Elec. Co.*, 193 Iowa 1127, 1134. No one would claim, of course, that the proof must be beyond a reasonable doubt. *Swaim v. Chicago, R. I. & P. R. Co.*, supra, at 472; *Duncan v. Fort Dodge Gas & Elec. Co.*, supra. Other cases state that, when facts are proved which show a cause which might produce an accident in a particular way, and an accident happens *in that manner*, it is a warrantable presumption, in the absence of some showing to the contrary, that the known cause was the one that produced the result. *Woodard v. Chicago, R. I. & P. R. Co.*, supra, at 522, citing *Lehman v. Minneapolis & St. L. R. Co.*, supra; *Brownfield v. Chicago, R. I. & P. R. Co.*, supra; *George v. Iowa & S. W. R. Co.*, supra. In the instant case, though the accident might have happened in the way appellee contends, if it had been shown that the last five cars ran into the two north cars with excessive force, negligently, then, in the language of the cases, there would be a warrantable presumption, if there was no showing to the contrary. But it is not shown that plaintiff's theory was the known cause. There is a showing to the contrary. Other causes are shown

which are at least equally probable, and better supported. Indeed it is, we think, more probable that deceased slipped on the wet and sleety car, or in some of the other ways suggested; and especially is this so since there is no evidence that it occurred in the manner claimed by plaintiff. If the lantern fell "just before" the impact, it would indicate that this was not the cause of the injury. Kennedy's evidence is indefinite as to whether the lantern fell at the moment of or just before the impact.

Appellant's contention is that, if the evidence is equally as consistent with a theory of no negligence as with negligence, then the proof is, as a matter of law, insufficient to establish the negligence charged, and the court should direct a verdict for the defendant. *O'Connor v. Chicago, R. I. & P. R. Co.*, 129 Iowa 636; *Neal v. Chicago, R. I. & P. R. Co.*, 129 Iowa 5; *Eisentrager v. Great-N. R. Co.*, 178 Iowa 713; *Sparks v. Consolidated Indiana Coal Co.*, 195 Iowa 334; *Gibson v. Iowa Cent. R. Co.*, 136 Iowa 415; *Dingmon v. Chicago & N. W. R. Co.*, 194 Iowa 721. And further, that it is error for the trial court to submit to the jury an issue of negligence upon which the evidence is insufficient to justify a finding in favor of the plaintiff. *Cresswell v. Wainwright*, 154 Iowa 167; *Glanville v. Chicago, R. I. & P. R. Co.*, 190 Iowa 174; *Bennett v. Atchison, T. & S. F. R. Co.*, 191 Iowa 1333, 1338; *Mulstay v. Des Moines Union R. Co.*, 195 Iowa 513; *Yeager v. Chicago, R. I. & P. R. Co.*, 148 Iowa 231. It is appellant's contention that the *O'Connor* case is on all fours with this case. It is quite similar in its facts, and we think in point, as are some of the other cases. It was there held that the manner in which deceased met his death was a matter of conjecture, and that a motion for directed verdict was properly sustained. Briefly, the facts in that case were that a brakeman, in the night, fell, or was in some manner thrown, from the top of a car, run over, and killed. It was claimed that the brake on the end of the car was out of repair, and that, in attempting to set the brake, he was thrown off the car. A piece of his clothing was found on a bolt at the brake. There was nothing else to indicate that he was at the brake at all. It was held that it was as probable that he slipped and caught his clothing, as that he was setting the brake, and that, there-

fore, the evidence was insufficient to connect the injury with the alleged negligence.   We said:

"The law on this point is well settled.   Proof of the defective condition of the car, and of the death of the intestate, due to his being run over by the car, is not sufficient to take the case to a jury.   In other words, the burden of proof was upon plaintiff to show causal connection between the alleged negligence and the injury complained of.   And where the proof is equally balanced, or the facts are as consistent with one theory as another, plaintiff has not met the burden which the law casts upon him.   Of course, plaintiff is not required to produce more than a preponderance of the testimony; but if his evidence does no more than create a surmise or conjecture, he cannot recover. Proof of causal connection may be direct or circumstantial, but the evidence must be something more than consistent with plaintiff's theory as to how the accident occurred.   These rules are well supported by our cases.   *Asbach v. R. Co.,* 74 Iowa 251; *Wheelan v. R. Co.,* 85 Iowa 167; *Rhines v. R. Co.,* 75 Iowa 597."

See, also, *Duncan v. Fort Dodge Gas & Elec. Co.,* supra, at 1134, where, unlike the instant case, the doctrine of *res ipsa loquitur* was applicable.   The *O'Connor* case was distinguished in *Paulson v. Bettendorf Axle Co.,* 146 Iowa 399, 403.   It was distinguished only because of the facts.   The rule was recognized and adhered to.   But in the *Paulson* case, it was held that there was evidence from which the jury could have found that the negligence complained of was the cause of the accident.   The rule of the *O'Connor* case is followed in the *Eisentrager* case, supra, at 724; *Tisher v. Union P. R. Co.,* 173 Iowa 567, 570; *Miller v. Hart-Parr Co.,* 165 Iowa 181, 187; *Ashcraft v. Davenport Locomotive Works,* 148 Iowa 420, 426, 427; *Helgeson v. Higley Co.,* 148 Iowa 587, 591, 592; *Sparks v. Consolidated Indiana Coal Co.,* supra; *Dingmon v. Chicago & N. W. R. Co.,* supra; and the other cases cited by appellant.

Without pursuing the subject further, we are of opinion that, even though plaintiff had shown the alleged negligence relied upon, still there would be no causal connection.

3.   It is thought by appellee that, by offering instructions, appellant admitted that there were facts to go to the jury, and waived the right to object to the submission of the question

(citing *Gordon v. Chicago, R. I. & P. R. Co.*, 154
Iowa 449; *Bonnot Co. v. Newman Bros.*, 109 Iowa

**3. Trial: waiver of exceptions.**

580; *Hahn v. Miller*, 60 Iowa 96). Appellant
offered an instruction to this effect: That the evidence is wholly
insufficient to justify a recovery on the part of plaintiff, and
that the jury should return a verdict for the defendant. It also
offered two others, to the general effect that, if the circumstances
relied upon by plaintiff are as consistent with the theory that
the accident may have occurred without any negligent handling
of the cars, the verdict should be for the defendant. The de-
fendant insisted, at all stages of the trial, by motion to direct
a verdict and otherwise, as they are contending here, that the
evidence was insufficient. Under the circumstances of the case,
we think there was no waiver. *Harper & Ward v. Kurtz*, 188
Iowa 1047; *Johnson v. City of Denison*, 186 Iowa 949.

Other questions are argued. It is unnecessary to discuss
them, since the propositions before discussed are decisive of the
case.

After a careful examination of the record, we reach the
conclusion that the judgment ought to be reversed. It is—
*Reversed and remanded.*

Arthur, C. J., and Evans and Faville, JJ., concur.