GEORGE W. THOMPSON, Administrator, Appellant, v. H. N. ANDERSON, Appellee.

No. 42128.

JANUARY 9, 1934.

MOTION TO DISMISS PETITION FOR REHEARING SUSTAINED MARCH 16, 1934.

Robertson & Wolfe, and Welch & Virtue, for appellant.

Tinley, Mitchell, Ross & Mitchell, for appellee.

DONEGAN, J.—George W. Thompson and his wife, Gertrude E. Thompson, lived on a farm near Woodbine, Harrison county, Iowa. On August 20, 1932, Gertrude E. Thompson stepped on a stick of wood which turned up and struck the top of her foot and inflicted a wound thereon. Home remedies were applied to the wound, and after a few days the inflammation and swelling which followed the injury seemed to have subsided. On August 30, 1932, Mrs. Thompson complained of stiffness in her jaws, pain in her face and neck and inability to swallow, and on the afternoon of that day she and her husband called at the office of Dr. H. M. Anderson in Woodbine in reference to her condition. Dr. Anderson was told Mrs. Thompson's symptoms and was given a history of the injury to her foot. The doctor examined the foot, but prescribed no treatment for it. Mr. Thompson asked the doctor whether it might not be possible that Mrs. Thompson was suffering from tetanus due to the injury to the foot, and the doctor answered that he did not think so, that it had been too long anyway, and that she had probably caught cold sleeping with the window open. Dr. Anderson advised Mr. and Mrs. Thompson that they should go home and that, if Mrs. Thompson got any worse by morning to take her to a hospital. The Thompsons returned to their home, and about eleven o'clock that night Mrs. Thompson had a convulsion. On the following morning, about six o'clock, a son of the Thompsons telephoned Dr. Anderson and asked him to come out and bring another doctor with him. In talking to the son, Dr. Anderson told him that they should immediately take Mrs. Thompson to a hospital in Council Bluffs and have either Dr. Augustine or Dr. O'Keefe called to attend her. Mrs. Thompson was taken to the hospital that forenoon and Dr. Augustine called. He immediately diagnosed the case as one of tetanus, opened and treated the wound in the foot, and gave her antitetanic serum. Mrs. Thompson continued to get worse and died about eleven o'clock in the forenoon of the next day, September 1, 1932. George W. Thompson was appointed administrator of the estate of his deceased wife, and brought this action against Dr. Anderson for malpractice, alleging that the death of Mrs. Thompson was caused by the negligence of the defendant. The defendant filed a general denial, and the case went to trial. At the close of the plaintiff's evidence, the

defendant filed a motion for a directed verdict, which was sustained by the court. From this ruling of the court, the plaintiff appeals.

The motion for directed verdict contains several grounds. For the purpose of this appeal, it is necessary to consider only the grounds of such motion in which it is alleged, in substance, that the evidence of the plaintiff failed to show that the negligence of the defendant, if any, was the proximate cause of the death of Gertrude E. Thompson.

In passing upon a motion for a directed verdict, we are, of course, governed by the well-recognized rule that all the evidence tending to sustain the plaintiff's claim must be taken as true and given inferences favorable to plaintiff of which it is reasonably susceptible. Appellant contends that, if this rule be followed, the evidence will be found to be sufficient. Appellee, on the other hand, contends that, even though the evidence might be sufficient to establish negligence on the part of the appellee, it is not sufficient to warrant the submission of the case to a jury, because it fails to show that the negligence of the appellee was the proximate cause of the death of Mrs. Thompson. The question for our determination is, therefore, does the evidence present facts from which the jury should have been allowed to determine whether or not the death of appellant's decedent was caused by the negligence of the appellee.

Another rule which must be borne in mind in cases involving malpractice is that a jury may not be allowed to draw its conclusions as to the cause of untoward results from a mere showing of negligence or unskillfulness and the results which followed. In other words, it is not sufficient to show that the defendant in a malpractice case did or neglected to do a particular act or acts, and that, following this commission or omission on his part, unfavorable conditions or happenings appeared. A causal connection between the negligence and the unfavorable condition or happening that followed must be shown, and this is usually done by the testimony of expert witnesses. See Snearly v. McCarthy, 180 Iowa 81, 161 N. W. 108; Ramberg v. Morgan, 209 Iowa 474, 218 N. W. 492; O'Grady v. Cadwallader, 183 Iowa 178, 166 N. W. 755.

The only evidence of the causal connection between the alleged acts of malpractice of the appellee and the death of appellant's decedent in the instant case is found in the testimony given by expert witnesses. Turning to the evidence given by such witnesses, we find that four doctors testified in behalf of the plaintiff. All of

these doctors agreed that the proper treatment for an injury from which tetanus might be expected to result is to open and clean the wound and let in the light and oxygen, and to administer a prophylactic dose of antitetanic serum. Dr. Augustine, who treated appellant's decedent after she had been placed in the hospital in Council Bluffs, in the course of his testimony stated:

"Q. Assume that a physician is called upon to attend a person who is suffering from a well-defined case of acute tetanus without knowing any more, is it possible for the physician to say whether or not antitetanic serum is going to prove effective if administered to that patient? A. It is not possible for him to tell.

"Q. That would depend wholly upon whether at the time it was administered, the antitetanic serum was administered, whether or not the tetani toxin at that time had already combined with the nerve cells? A. Yes, sir. * * * As a medical man I recognized that the convulsion was evidence that on the night of August 30, the tetani toxin had combined with the nerve cells. That would compel me to reach the conclusion that the night preceding Mrs. Thompson was suffering from acute tetanus so far advanced that there had been a fixation of the tetani toxin with the nerve cells. * * *

"Q. If the case is properly diagnosed and properly treated for almost any disease the probability is that the patient will get well if treatment is given at the right time? A. That is not so. For instance, in tetanus, after the case has once started the majority of them die.

"Q. Well, do more of them die in proportion than in lots of other diseases? A. Yes, the mortality is very high. * * *

"Q. So you do not mean to tell the jury that when the case has become well developed and symptoms well defined so there cannot be any question about the patient suffering from tetanus, that it is possible to say what if any result the administration of antitetanic serum will have? A. It would be impossible to tell. * * *

"Q. Now, Doctor Augustine, from what you learned of that woman and the examinations that you made of her can you tell the jury, basing your answer on your experience as a physician and your studies as a physician, whether or not 16 hours sooner or on the afternoon of August 30, a given amount of antitetanus serum would have been effective in checking that disease? A. The chances are it would have made no difference in her ending. * * *

"Q. Now as a physician and surgeon of 30 years' practice you will tell the jury that for you to say at this time from what you know of this woman if she had been given on the 30th of August, 1932, a given number of units of antitetanic serum, to say she would get well, would be simply basing your answer on guesswork and speculation? A. Yes, sir."

Dr. Kennedy testified as follows:

"Q. Now, Doctor, if those treatments you have described are properly given would not that tend to probably effect a cure in the patient? Just answer 'yes' or 'no.' A. No. I cannot answer 'yes' or 'no.'

"Q. Well, make a speech then. A. No, I won't make a speech. I will give the facts. The facts are 40 per cent of all the people die with lockjaw and that 50 per cent of the cases which have intravenous or intraspinous injections of the antitoxin get well."

Dr. Williams testified as follows:

"Q. What is the fact about the chances of the patient recovering, recovery being greater if the patient lives the first four days? A. Well, that is pretty hard to say. I have seen them. I have seen them live a good while longer, then die. * * *

"Q. Now, if you give the right amount of that serum and administer the other proper treatment in the case, the probabilities are that the patient would get better or recover, is that not a fact? A. You cannot tell what a case of lockjaw is going to do, live or die * * *

"Q. Now, Doctor Williams, where a physician is confronted with a well-defined and developed case of acute tetanus and it is his best judgment that antitetanus serum should be administered to the patient, whether or not that serum is going to prove effective in retarding the progress of the disease is speculative and conjectural, is it not? A. It is.

"Q. And a doctor does not know, and no doctor knows about that? A. Can't tell about it."

Dr. Walsh testified as follows:

"Q. Now, what would be the usual and ordinary probability of these treatments helping cure the disease and keeping those serious germs from getting into the body of the patient and the patient get-

ting relief? A. They don't all get well with lockjaw. The probability is that with such treatment the patient would recover.

"Q. Can you tell the jury what percentage of recovery there is in such cases of lockjaw where all of those treatments are given to the patient according to the latest authorities? A. I think it is about one in four. I think about 80% recover. * * * The resistance that a particular individual had against the ravages of the disease would have something to do with it, and another thing would be the acuteness or virulence of the germ itself. * * * Our profession recognizes, and it is a scientific fact, that the only hope of a cure of tetanus depends upon early treatment. Our profession recognizes that the one known agent of proven worth in the treatment of this disease is the use of antitetanic serum, and our profession recognizes that the use of antitetanic serum is only effective when this toxin thrown off by the bacillus, or produced by it, is still free in the blood stream or lymph or at the wound site.

"Q. When the toxin produced and created by the bacillus tetani gets into the blood stream or in some way through the nerve system and becomes fixed with the nerve cells then the antitetanic serum will not neutralize it and it is not effective, is it? A. The serum is effective sometimes.

"Q. So that if you have a patient that you know is suffering with tetanus you can not simply say by looking at that patient that a given number of units of antitetanic serum is going to be effective? A. No.

"Q. Your profession recognizes, Doctor Walsh, that the use of antitetanic serum is more effective when used as a prophylactic? A. Yes.

"Q. And by a prophylactic treatment you mean a treatment administered immediately after the wound, a puncture wound has been produced? A. Yes, sir.

"Q. You know people have died with the disease known as tetanus when everything known to the medical profession has been done for them to try to produce or effect a recovery? A. Yes. * * *

"Q. Now, if it is a fact, Doctor Walsh, that on the evening of August 30, 1932, this lady was suffering from tetanus—assuming she had tetanus on that date—and that she had convulsions, that would show you as a medical man, would it not, that the toxin produced by the bacillus had become fixed with the nerve cells if she

had convulsions? A. Why, that would show you there was some fixation. \* \* \*

"Q. Is it true if this tetanus was of an acute type and within ten days no antitetanic serum having been administered to her that within that period the disease might have developed to such an extent that the tetani toxin had become combined with the nerve cells? A. Yes, sir.

"Q. If that is possible, Doctor Walsh, it is possible commencing on August 30, 1932, 10 days after she became inoculated everything known to the profession proper in the treatment of tetanus might have been done for Mrs. Thompson and still she might have died. Is that true as a scientific statement? A. Yes.

"Q. I will ask you again, Doctor Walsh, as a medical man, skilled in the practice of your profession for a number of years, that to say what the outcome will be where the patient is suffering from tetanus regardless of the highest degree of care exercised in the treatment of the disease is speculative and conjectural, is it not? A. Certainly."

It is quite apparent from the testimony of these experts that none of them has given it as his opinion that any treatment that the appellee might have administered to the appellant's decedent on the afternoon of August 30, 1932, would have been effective to prevent her death. In fact, some of them expressly state, and a fair analysis of the testimony of the others clearly shows, that to say that the death of Mrs. Thompson was caused by anything done or omitted by appellee would be pure conjecture and speculation.

Appellant places considerable stress upon that portion of Dr. Walsh's testimony in which he states that the death rate in cases of tetanus, where the wound is properly taken care of and antitetanic serum given, is about one in four. The mere statement that a certain percentage of these cases shows a recovery can be of no value to appellant, without further evidence tending to place this case in the number of those where recovery takes place. The further testimony of this witness, however, shows that by prophylactic treatment he meant treatment administered immediately after the wound was inflicted; that the resistance of a particular individual and the virulence of the germ would make a difference in the results; that the only hope of a cure depends upon early treatment; and, finally, that the outcome in any case is speculative and conjectural.

In the case of Ramberg v. Morgan, 209 Iowa 474, 218 N. W. 492, there was involved the question whether death was caused by a skull injury or the negligence of a doctor in treating the injured person. In reversing the lower court and holding that the evidence was not sufficient for submission to the jury, we said:

"There must be causal connection between death of plaintiff's intestate and the negligence of the defendant as alleged. There must be something more than a showing that the evidence is consistent with plaintiff's theory of the cause of death. The evidence must be such as to make that theory reasonably probable,—not merely possible,—and more probable than any other hypothesis based on such evidence. * * *

"Under the well-established rules of decision, is it possible to say that Ramberg would not have died if he had been given medical attention such as is ordinarily given by medical practitioners of the same school in that community or similar localities? Can a jury of laymen make a finding on a question that plaintiff's own physicians cannot, with any certainty, answer? Clearly not.

"The traumatic injury had its origin prior to the time that the defendant was called in a professional capacity. The injury was an adequate, probable, if not an inevitable, cause of ultimate death. The plaintiff was bound to concede the original injury, and the burden was upon her to prove, by a fair preponderance, that the defendant's negligence was adequate as a probable cause of aggravation or acceleration of its fatality. To put it another way, it was necessary for the jury to find, upon proper evidence, that the death of the decedent would not have occurred on January 25, 1926, but for the alleged negligence charged against the defendant. It was incumbent upon the plaintiff to produce evidence to sustain such a finding. * * *

"The record in the case at bar emphasizes the fact that any conclusion with reference to the cause of death being referable to the defendant's negligence is mere conjecture, and falls far short of that reasonable certainty which the law requires for the support of verdicts."

See, also, Hawthorne v. Delano, 172 Iowa 44, 152 N. W. 17; Tisher v. U. P. Railway Co., 173 Iowa 567, 155 N. W. 975; Hall v. Chicago, R. I. & P. R. Co., 199 Iowa 607, 199 N. W. 491.

Of course, we do not mean to say that the causal connection

1194

between the alleged acts of malpractice and the death of appellant's decedent must be shown by direct and positive evidence; but as stated in Ramberg v. Morgan, supra:

"The evidence must be such as to make that theory reasonably probable,—not merely possible,—and more probable than any other hypothesis based on such evidence."

In our opinion, the evidence of the expert witnesses not only fails to show any probability that the death of appellant's decedent would not have resulted from tetanus, regardless of any negligence or malpractice on the part of the appellee, but it unmistakably establishes that any attempt to show that such death was caused by any act or omission to act on the part of appellee, instead of by the disease from which she was suffering, would be pure speculation and conjecture. If the attempt to thus fix the cause of the death of appellant's decedent would be speculation and conjecture on the part of experts themselves, it must be clear beyond all doubt that the question of the cause of such death should not be submitted to a jury.

We find no error in the action of the trial court in sustaining the motion for a directed verdict, and the ruling on such motion is hereby affirmed.—Affirmed.

CLAUSSEN, C. J., and EVANS, STEVENS, ALBERT, and KINDIG, JJ., concur.