LOHR, Appellant, v. WATSON, Respondent

(2 N. W.2d 6.)

(File No. 8462. Opinion filed January 27, 1942.)
Rehearing Denied March 11, 1942.

**Case & Case,** of Watertown, for Appellant.

**Walter Stover,** of Watertown, and **S. S. Larson,** of Minneapolis, Minn., for Respondent.

SMITH, J.   Plaintiff sought damages for alleged malpractice from defendant, a physician.   The trial court directed a verdict for defendant at the close of plaintiff's case. The principal assignment predicates error on that ruling.

■   Under well settled principles, we consider the evidence in the light most favorable to plaintiff. (Clinkscales v. Wisconsin Granite Co., 38 S. D. 205, 160 N. W. 843; Commercial & Savings Bank v. Duitsman, 48 S. D. 534, 205 N. W. 379), for the purpose of determining whether there is any substantial credible evidence which would have supported a verdict of the jury for plaintiff.   Wolff v. Stenger, 59 S. D. 231, 239 N. W. 181.

The evidence developed the following facts. The defendant, at the times in question, was practicing his profession at Estelline, South Dakota, where he maintained and operated a small hospital. Plaintiff entered that hospital and submitted himself to treatment by defendant on February 18, 1936. He was then suffering from pneumonia. During this illness plaintiff received serum injections. He was discharged as convalescent on March 7, 1936, and was instructed by defendant to remain quiet. Shortly after his discharge from the hospital he complained to defendant of aching joints and was advised that his condition was the result of his illness and that his system would throw it off. Medication was prescribed by defendant. Thereafter, plaintiff's trouble localized or settled in his left hip. He advised defendant of that fact. On April 23d defendant made a thorough physical examination of plaintiff and made a note of his tentative diagnosis on his office records in words as follows: "Impression: Acute infection, arthritis of left hip precipitated by trauma." This office record shows "Temperature 99.2, white blood count 7,800, considerable pain in left hip on motion. No tenderness, swelling or local heat. X-ray of the hip shows normal bone texture, no evidence of periosteal thickening and no sign of cartilage destruction." From the date of his discharge from the hospital plaintiff had been down town almost every day and had been driving his car. Defendant had seen him around. On April 25th defendant was called to attend plaintiff at home, and while there suggested hospitalization. Plaintiff entered the hospital that afternoon. He was put to bed and a Buck's extension applied to the leg. Part of the doctor's progress notes were introduced by plaintiff and contain the following notations:

"4-25-36: Comes in on crutches. Pain in hip so severe as to interfere with sleep. T 99.4 W B C 8,200. No tenderness or swelling or redness about hip joint but considerable pain on motion. X-ray of left hip reveals no evidence of bone involvement or cartilage destruction. Periosteum is smooth. Hospitalized for observation and immobilization.

"4-26-36: Buck's extension applied last night with 6 lbs wt—increased this morning to 10 lbs. Pt. uncooperative and vulgar.

"4-28-36: No change in condition. Says pain is severe but there is no tenderness. * * *

"4-30-36: Hip joint still negative to palpation. No heat or tenderness. Patient doesn't want enemas and refuses cathartics.

"5-2-36: Still no heat or tenderness about joint. Temp. receding slightly—has dropped from high of 101.8 on 4-28 to high of 99.8 today. W B C 9,000.

"5-4-36: Seems slightly better. Weight removed long enough to allow patient up in chair today for 30 min. Refuses enemas.

"5-10-36—Pain the same. Weight removed a little each day for manipulation of ankle and knee and massage. Foreign protein injections to be started tomorrow.

"5-12-36. Satisfactory temp. response to foreign protein yesterday. Feels a little better.

"5-16-36 Second injection of foreign protein yesterday with satisfactory response and considerable alleviation of pain. Patient is very abusive and uncooperative."

The plaintiff testified that defendant told him on April 25th that the X-ray showed a piece of cartilage in the joint, and that extension was being applied to let it flow out. He also stated that the doctor told him on a later date that he was injecting malaria germs to induce a fever and kill that which was in his hip.

The treatment between April 25 and May 29 consisted of the extension of the limb for about two weeks, constant heat, Oxate B tablets, and other medication to induce sleep or relieve pain. Other X-rays were taken. During this time plaintiff complained constantly of severe pain. On May 29th defendant explored the hip joint with an aspirating needle and withdrew pus. This pus contained pneumococci germs. That afternoon he made a posterior incision and established drainage. Thereafter plaintiff remained at the hospital under treatment by defendant and his assistant until August

14, 1936. During this period drainage was maintained, the wound was dressed, ultraviolet and infrared light applied, the limb was again extended for a period, some irrigation was attempted, and medicine was given to relieve pain. On August 14 plaintiff was taken to the Mayo Clinic at Rochester. He was there examined. The X-ray then made disclosed that the cartilage of the left hip had been destroyed. While there the sinus of infection was curetted, drainage maintained, and spica cast applied. On August 27th plaintiff was permitted to return home. Thereafter he visited the Mayo Clinic on January 26, 1937, on March 17, 1937, and on October 27, 1937. Different casts were applied during these visits. Drainage had not ceased until sometime before the October trip. By that time the hip joint had fused and there was practically no motion in it. As an end result plaintiff has a stiff hip and an impaired knee.

By his complaint and argument here plaintiff rests his case upon a specific ground. It is asserted in substance that defendant was negligent in that although he had determined that plaintiff was suffering from an infectious arthritis on April 23d, he failed to aspirate the hip and establish drainage until May 29th.

█ Because the central issues of this case, viz., (a) negligence, and (b) its causal connection with the injury suffered by plaintiff, turn upon scientific questions laymen are not qualified by learning or experience to answer, plaintiff was required to establish those elements by the testimony of experts. Wigmore on Evidence, 3d Ed., § 2090.

To establish these elements of his case plaintiff presented two qualified physicians. When the entire record is analyzed in the light of the statement by one of these experts to the effect that a practitioner would want to be certain that there was pus before he aspirated or opened a hip joint, and of the fact that the other physician was careful to predicate his testimony on the assumption that the attending physician knew he was dealing with a septic hip, there is room for grave doubt as to the sufficiency of the evidence to warrant an inference of negligence. However,

in view of the opinion we have formed, it becomes unnecessary for us to determine that issue. We therefore assume, but do not decide, that there is sufficient evidence in the record to support an inference of negligence in failing to establish drainage from the hip at an earlier stage of the treatment, and turn to a review of the evidence to determine its sufficiency on the issue of causal connection between the assumed negligence and the lamentable resulting condition of the hip.

█ `The standard of treatment established by the testimony of plaintiff's experts included drainage of the infected area as soon as the physician was certain of its septic condition. However, addressing himself to the nature of plaintiff's malady, Dr. Kellogg testified that "there is little hope of preserving joint motion even with early drainage, and that such an infection is very difficult to treat, and very slow in healing." Further, both of these physicians who testified as experts treated plaintiff during the final period of his illness and gave direct testimony as to his condition. Speaking from personal knowledge of his case they asserted that they discovered nothing in his condition which indicated neglect on the part of defendant. In other words, both of these physicians viewed plaintiff's unfortunate condition as an expected result of the infection. The most that can be gathered from the evidence as bearing on the issue of causation is that early drainage and exact classification of the attacking organism improves the prognosis. Thus the record discloses that plaintiff's experts established two theories of causation, only one of which is chargeable to defendant. The applicable rule in such a case finds lucid expression in Yates v. Gamble et al., 198 Minn. 7, 268 N. W. 670, 674. "In negligence cases and especially in malpractice cases, proof of causal connection must be something more than consistent with the plaintiff's theory of how the claimed injury was caused. The burden is on plaintiff to show that it is more probable that the harm resulted from some negligence for which defendant was responsible than in consequence of something for which he was not responsible."

■■ An inference that it is more probable that plaintiff's impairment resulted from defendant's assumed negligence than from the normal ravages of the infection is without substantial support in the expert testimony and is therefore without substantial support in the evidence. Such an inference, in this state of the record, would rest on speculation and conjecture and a verdict based thereon could not stand. Murphy v. Sioux Falls Serum Co., 47 S. D. 44; 195 N. W. 835; Ramberg v. Morgan, 209 Iowa 474, 218 N. W. 492; Thompson v. Anderson, 217 Iowa 1186, 252 N. W. 117; McKinnon v. Polk, 219 Ala. 167, 121 So. 539; Matuschka v. Murphy et al., 173 Wis. 484, 180 N. W. 821; Gallagher v. Kermott et al., 56 N. D. 176, 216 N. W. 569. The cases on proximate cause in malpractice actions are collected in 59 A. L. R. 884.

We therefore conclude that the learned trial court did not err in ruling on the motion for a directed verdict.

Appellant assigns error on numerous rulings on the admission of evidence. A careful study of these assignments against the background of the entire record has convinced us that if technical error was committed in any of these rulings it was error without prejudice to plaintiff.

The judgment of the learned trial court is affirmed.

All the Judges concur.