THERESA PITTS *vs.* WINGATE AT BRIGHTON, INC.

No. 11-P-1811.

Suffolk. June 1, 2012. - July 26, 2012.

Present: KANTROWITZ, WOLOHOJIAN, & MILKEY, JJ.

*Nursing Home. Negligence,* Nursing home, Causation, Expert opinion. *Practice, Civil,* Directed verdict. *Evidence,* Expert opinion. *Witness,* Expert.

Discussion of the standard of review when a judge directs a verdict in a defendant's favor after the plaintiff's opening statement. [286]
In a civil action against a nursing home, alleging that a nurse's aide was negligent in allowing the plaintiff to fall to the ground while transferring her to a wheelchair, the judge erred in directing a verdict in favor of the nursing home after the plaintiff's opening statement, where, even without the aid of expert testimony, the jury reasonably could have concluded that the plaintiff's falling to the floor caused or was a substantial contributing factor to her injuries. [289-292]

CIVIL ACTION commenced in the Superior Court Department on October 20, 2004.

The case was heard by *Linda E. Giles*, J.

*Stephen J. Lyons* for the plaintiff.

*Barbara Hayes Buell* for the defendant.

MILKEY, J. The plaintiff sustained two broken bones while she was a patient at Wingate at Brighton, Inc., a nursing home. She brought this malpractice action alleging that her injuries were caused by a nurse's aide negligently allowing her to fall to the ground while transferring her to a wheelchair. On the day that trial was scheduled to begin, the judge held an extensive pretrial colloquy with counsel regarding their expectations as to what the evidence would show. Based on the understanding she gained from that process, the judge concluded that the plaintiff's failure to put forward a qualified expert on causation doomed her case as a matter of law. On this basis, the judge granted a directed

verdict to the nursing home after the plaintiff's opening statement.[1] We reverse.

*Standard of review.* A trial judge can in appropriate circumstances direct a verdict in a defendant's favor after the plaintiff's opening statement. "It is settled, however, that 'the practice of ordering a verdict on an opening . . . is a power which, for obvious reasons, should be exercised with great caution.' " *Hubert* v. *Melrose-Wakefield Hosp. Assn.*, 40 Mass. App. Ct. 172, 176 (1996), quoting from *Upham* v. *Chateau de Ville Dinner Theatre, Inc.*, 380 Mass. 350, 351 n.2 (1980). In any event, "[t]he judge must take the statements and all rational inferences therefrom in the opening as true, and regard them in the light most favorable to the plaintiff. If any reasonable view of the facts and rational inferences supports the plaintiff's claims, the motion must be denied." *Ibid.* (citations omitted). See *A.C. Vaccaro, Inc.* v. *Vaccaro*, 80 Mass. App. Ct. 635, 641 (2011), quoting from *Global Investors Agent Corp.* v. *National Fire Ins. Co. of Hartford*, 76 Mass. App. Ct. 812, 827 (2010) (on appeal of directed verdict, reviewing court asks "whether 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be made in favor of the [plaintiff]' "). "In instances involving close questions, the safer course is to hear the evidence." *Hubert* v. *Melrose-Wakefield Hosp. Assn., supra* at 176, quoting from *Douglas* v. *Whittaker*, 324 Mass. 398, 400 (1949). "Whether the judge properly directed a verdict is a question of law." *Hubert* v. *Melrose-Wakefield Hosp. Assn., supra.*

*Background.* The recitation that follows draws on the plaintiff's opening statement, supplemented by the documentary record and concessions the parties made at the pretrial hearing or

---

[1]The pretrial hearing was prompted by the nursing home's motion in limine. That motion sought to preclude the plaintiff from using a registered nurse (the plaintiff's expert on the standard of care) as an expert on medical causation. The judge granted the motion, and the plaintiff does not contest that ruling on appeal. The judge then focused on whether the plaintiff could proceed without an expert on causation. Concluding that an expert was necessary, the judge informed the parties that she intended to dismiss the case after the plaintiff's opening statement. The plaintiff agreed to the judge's proposed procedure of waiving her right to a jury trial for the limited purpose of creating a record for the judge to grant a directed verdict in the nursing home's favor. The plaintiff reserved her right to a jury trial if she prevailed on appeal.

in their joint pretrial brief.[2] As noted, many of the background facts are undisputed. Where there are contested facts, we read those disputes in favor of the plaintiff.

It is undisputed that at the time of the injury, the plaintiff was fifty-three years old, stood five feet, three inches tall and weighed approximately 200 pounds. She suffered from numerous serious medical conditions, including a brain disorder known as leuko-dystrophy, dementia, seizures, and "profound osteoporosis." The plaintiff was brought to the nursing home for physical rehabil-itation. The goal was that she again be able to ambulate on her own using a walker. According to the nursing home's own evalu-ation of the plaintiff, that was done upon her arrival, she presented a "potential for falls." With regard to the level of assistance required for transfers to the bathroom and the like, the nursing home's "care plan" for the plaintiff specifically indicated that an "assist of two" should be employed.

At approximately 2:00 P.M. on October 21, 2001, the plain-tiff's daughter went to the nursing home for her second visit of the day. She found her mother sitting on a toilet, where a nurs-ing home employee had brought her some undisclosed time before. The daughter had her mother pull the cord next to the toilet to summon help, and a single nurse's aide responded. The aide informed the daughter that the person who had brought the plaintiff to the bathroom had gone to lunch. Then, outside the daughter's view, the aide sought to assist the plaintiff from the toilet into her wheelchair. The plaintiff fell to the ground, because the aide deviated from the applicable standard of care in at least three respects: trying to do the transfer alone when two aides were required, failing to use a device known as a "gait belt," and failing to lock the wheels of the wheelchair.[3] The aide admitted to the daughter in the immediate aftermath of the incident that

[2]See Sereni v. Star Sportswear Mfg. Corp., 24 Mass. App. Ct. 428, 431 (1987) ("As a practical matter, a judge in ruling on a motion for a directed verdict on the opening will consider the theory or theories of the action disclosed in the complaint and as further developed by discovery. In the instant case, therefore, the judge properly would have considered not only the words spoken in the plaintiff's opening, but also the record previously made in the case").

[3]The plaintiff's claims as to the standard of care were supported by the anticipated testimony of a registered nurse. The nursing home acknowledged that the nurse was competent to testify on such issues.

the plaintiff "missed the wheelchair and fell on her 'bum.' " Moreover, the nursing home's own records document that the plaintiff "fell while transferring."[4] After the plaintiff fell, the daughter observed her mother "on the floor with her leg bent in front of her and her feet pushed up against the wall . . . holding on to the toilet and a bar on the wall so she would not fall further backwards and bang her head."

With the efforts of a second nursing home employee, the aide was eventually able to get the plaintiff into the wheelchair and back into bed. However, even as she was being wheeled back to her bed, the plaintiff began pointing to her leg and complaining of pain there. She had made no such complaints prior to this time.[5] The nursing home sent the plaintiff to a hospital where she was diagnosed with fractures in the tibia and fibula in the ankle area of her right leg.

---

[4]At the pretrial hearing, the nursing home asserted that its recording that the plaintiff "fell" is of little import, because any time a patient ends up on the ground, the nursing home has a regulatory duty to report this as a "fall." Even leaving aside the fact that no documentation of such a regulatory duty appears in the record, such an assertion could not properly be used to discount the evidence in the context of a motion for a directed verdict.

[5]The plaintiff's proof as to the timing of her injuries relied in part on statements she herself made (or did not make) before and after the incident, either to her daughter or to medical personnel. According to the opening statement, the plaintiff "could still communicate" at that time, something that is not contradicted by her counsel's acknowledgment that by the time of trial (eight years later), her dementia had progressed to the point that she was incompetent to testify. The plaintiff's ability to communicate some aspects of her condition at the time of the incident finds some support in medical records that indicate that she herself told hospital personnel both that she had pain in her right ankle and that "she fell injuring her [right] ankle," even while her leukodystrophy rendered her unable to "give further meaningful history." Although the judge raised concerns about whether the plaintiff's diminished mental capacity at the time of the incident called into question the reliability of any statements she had made, the judge did not say whether such doubts would go to weight or admissibility. Nor did the judge otherwise resolve whether any statements the plaintiff had made could come into evidence. We consider such statements for the purposes of the current appeal. Certain other medical records included statements suggesting that the plaintiff's having fallen was the cause of her injuries, without identifying who it was that made that causal link. Although the judge did not formally rule on the admissibility of those statements either, she did plainly state her intent to exclude them unless the source could be identified. Our ruling does not rely on those unattributed statements being admitted, and we do not reach the plaintiff's argument that these records were fully admissible pursuant to G. L. c. 233, § 79G.

The nursing home intended to call Dr. John C. Richmond as an expert witness with regard to the "mechanism" of the plaintiff's injuries, and what sorts of actions might have caused them. Dr. Richmond, a board certified orthopedic surgeon, was expected to testify that, "based on the severe demineralization suffered by [the plaintiff] and the spiral configuration of her right tibial fracture," the "fracture was pathologic in nature and thus not caused by trauma from a fall to the ground." He was also expected to testify that the bone breaks likely "resulted from a low velocity twisting motion."

In light of the plaintiff's osteoporosis and Dr. Richmond's anticipated testimony, the judge concluded that "expert orthopedic testimony" was necessary for the jury to understand when and how the plaintiff broke her bones. Because the plaintiff did not proffer such an expert, the judge granted a directed verdict in the nursing home's favor.

*Discussion.* A rational view of the plaintiff's evidence is that the plaintiff failed to describe any discomfort prior to her fall in the bathroom and she expressed pain as she was wheeled from the bathroom. The evidence permits a reasonable inference that she was uninjured before going into the bathroom, that the aide negligently caused her to fall to the floor, and that she suffered two broken bones by the time she was returned to her bed. The question presented is whether — without the aid of expert testimony — a jury reasonably could have concluded that the plaintiff's falling to the floor caused her injuries.

Expert testimony is necessary where proof of medical causation lies outside the ken of lay jurors. See *Held* v. *Bail*, 28 Mass. App. Ct. 919, 921 (1989) ("if the causation question involves questions of medical science or technology, the jury requires the assistance of expert testimony"). In fact, the medical malpractice case law recognizes that the causal link between the defendant's negligence and the plaintiff's harm "generally must be established by expert testimony." *Harlow* v. *Chin*, 405 Mass. 697, 702 (1989).

However, where a determination of causation lies within "general human knowledge and experience," expert testimony is not required. *Bailey* v. *Cataldo Ambulance Serv., Inc.*, 64 Mass. App. Ct. 228, 236 n.6 (2005), quoting from *Lovely's*

*Case*, 336 Mass. 512, 516 (1957). Such is the case here. The plaintiff's fall to the floor was an obvious, commonsense explanation for her injuries. No expert testimony is necessary for lay jurors to appreciate that allowing a nursing home patient to fall to the floor could cause a broken bone. Put differently, jurors could have accepted the plaintiff's commonsense explanation without relying on mere speculation or conjecture. See *Ward* v. *Levy*, 27 Mass. App. Ct. 1101, 1102 (1989) (explaining that expert testimony is required where "a jury would not be sufficiently instructed by common knowledge or experience but would be left to conjecture"). While this is not a case where the cause of the plaintiff's injuries was so obvious that it was incontestable,[6] neither is it one that relied on exotic medical theories that a jury could not understand without expert aid. Compare *Weinberg* v. *Massachusetts Bay Transp. Authy.*, 348 Mass. 669, 671 (1965) ("Whether a fracture of the ankle could give rise to such consequences, described by the plaintiff, as varicose veins and shortness of breath cannot be said to be a matter of common knowledge").

In sum, we agree with the plaintiff that the judge erred in dismissing her case, at least at the stage she did. The nursing home could have renewed its motion at the close of the plaintiff's case, at which point the evidentiary issues related to the plaintiff's proof of the timing of her injuries would have been resolved. See note 5, *supra*. At that time, it would have been significantly clearer whether the plaintiff could prove causation without an expert. See *Douglas* v. *Whittaker*, 324 Mass. 398, 399-400 (1949) ("the power to dispose of the case on the opening must be exercised cautiously[, and i]t should not be exercised until it is apparent that the plaintiff cannot supply the evidence necessary to establish [her] case").[7]

The looming presence of Dr. Richmond's anticipated testimony

---

[6]See *Bennett* v. *Winthrop Community Hosp.*, 21 Mass. App. Ct. 979, 982 (1986) (with regard to the lost tooth and cut chin that the plaintiff sustained falling from a gurney, we commented, "The fact of injury consequent upon a fall is incontestable").

[7]Earlier in this case, a medical malpractice tribunal had determined that the plaintiff's case was "sufficient to raise a legitimate question of liability appropriate for judicial inquiry." G. L. c. 231, § 60B. Although a tribunal ruling in a plaintiff's favor certainly does not preclude a judge from subsequently granting a directed verdict to a defendant, it provides some reason for added caution in doing so before the plaintiff has had the opportunity to put on her case.

does not mandate a different conclusion. It was not the plaintiff's burden "to show the exact cause of her injuries or to exclude all possibility that they resulted without fault on the part of the defendant." *Glicklich* v. *Spievack*, 16 Mass. App. Ct. 488, 495 (1983), quoting from *Samii* v. *Baystate Med. Center, Inc.*, 8 Mass. App. Ct. 911, 912 (1979). Instead, the plaintiff's duty was simply to "introduce evidence from which reasonable [people] may conclude that it is more probable that the event was caused by the defendant than that it was not." *Mullins* v. *Pine Manor College*, 389 Mass. 47, 58 (1983), quoting from *Carey* v. *General Motors Corp.*, 377 Mass. 736, 740 (1979). The fact that the nursing home — as part of its case — intended to present an alternative theory of causation supported by expert testimony does not mean that the plaintiff had a duty to present expert testimony as part of her own case.

Moreover, it would have been up to the jury to decide how much to credit Dr. Richmond's anticipated testimony. See *Commonwealth* v. *Cullen*, 395 Mass. 225, 229 (1985), quoting from *Commonwealth* v. *Lunde*, 390 Mass. 42, 47 (1983) ("The law does not give the opinions of experts the benefit of conclusiveness, even if there are no contrary opinions introduced at trial"). To the extent that the judge credited such testimony, she interfered with the jury's role as fact finder.[8]

Finally, as we have often cautioned, "[c]ases should be decided upon sworn evidence rather than upon an anticipatory statement of counsel which might bear little resemblance to the available evidence." *Hubert* v. *Melrose-Wakefield Hosp. Assn.*, 40 Mass. App. Ct. at 176, quoting from *Douglas* v. *Whittaker, supra* at 400. This principle is well illustrated by the current case. Because Dr. Richmond did not testify, and therefore was not subjected to cross-examination, we cannot glean the extent to which his expert opinions were in fact inconsistent with the plaintiff's theory of

---

[8]That the judge relied in part on Dr. Richmond's anticipated testimony seems inescapable. In statements akin to factual findings, the judge specifically concluded that the plaintiff's injury "could have occurred hours before . . . . It could have occurred the day before for all we know [or i]t could have occurred simply in the mechanism of standing up and putting 200 pounds of weight on bones that are susceptible to fracture." She also went so far as to find that "it is equally as likely that [the plaintiff's injuries] could have happened before the bathroom incident."

the case. That is because the plaintiff had no obligation to prove that her fall was the sole cause of her injury, only that it was a substantial contributing factor. See *Matsuyama* v. *Birnbaum*, 452 Mass. 1, 30-31 & n.47 (2008). Therefore, the plaintiff's osteoporosis presented the nursing home with a two-edged sword. Indeed, from all that appears in the current record, one is left to wonder why the fragile state of the plaintiff's bones would not have increased the likelihood that the aide's allowing her to fall caused her injuries.[9]

We reverse the judgment and remand this matter for further proceedings consistent with this opinion.

*So ordered.*

---

[9]Had the nursing home renewed its motion for a directed verdict after it had put on its defense, the judge would have had to consider the extent to which Dr. Richmond's actual testimony might have aided the plaintiff's case. See *Valade* v. *Springfield*, 7 Mass. App. Ct. 13, 15 (1979), quoting from *Mazzaferro* v. *Dupuis*, 321 Mass. 718, 719 (1947) ("we need consider only evidence favorable to the plaintiff from whatever witnesses it came, even if it was more favorable to the plaintiff than his own testimony"). And to the extent that Dr. Richmond's testimony about any alternative theories of causation implicated technical issues that the jury could assess only with expert aid, Dr. Richmond's own testimony might well have satisfied that need.