#28465-aff in pt & rev in pt-GAS
**2018 S.D. 60**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

ANITA HANSON and
MARVIN HANSON,                                          Plaintiffs and Appellants,

v.

BIG STONE THERAPIES, INC.
and MILBANK AREA HOSPITAL
AVERA,                                                          Defendants and Appellees.

\* \* \* \*
APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
GRANT COUNTY, SOUTH DAKOTA
\* \* \* \*
THE HONORABLE ROBERT L. SPEARS
Judge
\* \* \* \*

VINCENT A. PURTELL
STEVEN S. SIEGEL of
Heidepriem, Purtell, Siegel & Olivier, LLP
Sioux Falls, South Dakota                        Attorneys for plaintiffs and
                                                                 appellants.


GREGORY G. STROMMEN of
Banks, Kappelman & Strommen, Prof. LLC
Rapid City, South Dakota                          Attorneys for defendant and
                                                                 appellee Big Stone Therapies,
                                                                 Inc.


REED RASMUSSEN
Siegel, Barnett & Schutz, LLP
Aberdeen, South Dakota                           Attorneys for defendant and
                                                                 appellee Milbank Area Hospital
                                                                 Avera.

\* \* \* \*

CONSIDERED ON BRIEFS
ON MAY 21, 2018
OPINION FILED **07/25/18**

SEVERSON, Retired Justice

[¶1.] During a physical therapy session following hip surgery, the plaintiff patient began to experience increased pain in her leg. The pain did not subside and hospital staff later diagnosed the patient with a fractured femur. The patient and her husband brought suit against the physical therapy company and the hospital. They alleged that the physical therapist was negligent during the physical therapy session, that the hospital was negligent in failing to timely diagnose the fractured femur, and that the plaintiff patient was injured as a result of the negligence of both defendants. The defendants separately moved for summary judgment, and the circuit court granted the motions after a hearing. The plaintiffs appeal. We affirm in part and reverse in part.

## Background

[¶2.] On September 8, 2014, Anita Hanson underwent a right total hip arthroplasty at Prairie Lakes Hospital in Watertown, South Dakota. Dr. Michael Vener performed the surgery. After the surgery, Dr. Vener took x-rays, which confirmed a properly placed artificial joint. The x-ray did not reveal any fractured bones. Anita remained at Prairie Lakes Hospital until September 11. While at Prairie Lakes Hospital, Anita participated in physical therapy without difficulty.

[¶3.] On September 11, 2014, Anita was transferred to a swing bed at Milbank Hospital for post-operative rehabilitation. Dr. Vichit Vanadurongvan examined Anita upon her arrival. His notes reported that Anita was "doing quite well" and that her "pain [was] under control." John Lightfield, a physical therapist employed by Big Stone Therapies, Inc., also examined Anita after her arrival. PT

Lightfield noted that during his evaluation, Anita had no pain and had some tightness in her groin area. Later that evening, an employee of the Milbank Hospital helped Anita into bed. Anita heard a pop in her groin area, which she later claimed did not cause her significant pain.

[¶4.]    The next morning (September 12), Anita reported to hospital nursing staff that she did not have any pain but continued to experience "pulling" in her groin area. PT Lightfield provided physical therapy services to Anita in the morning and afternoon. Anita informed PT Lightfield about the popping noise she experienced the night before. During both physical therapy sessions, PT Lightfield used a geriatric chair located in Anita's room. The chair was not designed with a lever on the side. Thus, to recline the chair, PT Lightfield had to personally push on the seat back. To return the chair to a seated position, he had to manually push the footrest down. Anita claimed that during the physical therapy session, PT Lightfield placed a folding chair under the open footrest to ensure that the footrest did not unexpectedly return to a closed position, thereby causing the chair to return to an upright position. PT Lightfield could not recall if he used a folding chair but admitted that it could be possible. He further testified that the use of a folding chair "added reassurance" that the chair would not fold into the seated position.

[¶5.]    PT Lightfield's notes from the September 12 physical therapy session indicated that Anita was able to perform the same exercises she performed on September 11. She was also able to ambulate farther in each session. PT Lightfield reported that Anita was steady on her feet and that she denied any increased pain.

[¶6.] On September 13, Heidi Pauli, a physical therapist also employed by Big Stone, provided physical therapy services to Anita. PT Pauli also used the geriatric chair in Anita's room. Anita claimed that PT Pauli placed a folding chair under the raised footrest similar to that done by PT Lightfield. PT Pauli denied ever using a folding chair but admitted that she had seen one be used in a physical therapy session with a different patient.

[¶7.] During the physical therapy session with PT Pauli, Anita performed the same exercises as the day before and performed them without difficulty. She again was able to ambulate farther and denied any increased pain throughout the day. PT Pauli testified that it would be fair to say that Anita did not have a fractured femur when the physical therapy session ended.

[¶8.] On September 14, Anita woke with hardly any pain. She showered and reported a slight increase in pain. She received over-the-counter Tylenol. Laurie Batchelor, a physical therapist employed by Big Stone, provided physical therapy services to Anita in the afternoon. PT Batchelor also used the geriatric chair in Anita's room. PT Batchelor noted that Anita was tender and was having muscle spasms. She altered Anita's therapy session. According to Anita, after the session concluded, PT Batchelor left the room to find someone to help her ease the footrest down on the geriatric chair. Anita claimed that PT Batchelor could not find anyone to assist and instead asked Anita's husband, Marvin, to help. Anita and Marvin similarly claimed that before Marvin could assist, PT Batchelor forced the footrest shut, which caused Anita's leg to drop quickly and the chair to return to an

upright position. Anita alleged that she screamed out in pain and that PT Batchelor abruptly left the room and never returned.

[¶9.] PT Batchelor in contrast testified that after the physical therapy session concluded, Anita said that she needed to use the restroom. PT Batchelor claimed that Anita remained in the geriatric chair while she left Anita's room to find a nurse to assist. PT Batchelor testified that she found a nurse to help and that the nurse and PT Batchelor "got [Anita] back up" and to the bathroom. PT Batchelor testified that she left Anita in the care of the nurse. She denied that she ever asked Marvin to help close the chair. She further testified that Anita never shouted out in pain; instead Anita complained of more muscles spasms and raised her voice in regard to the muscle spasms.

[¶10.] After the physical therapy session with PT Batchelor, Anita described her pain as "off the chart." Nursing staff documented Anita's report that her pain was different or worse than previously experienced. Hospital staff gave Anita pain medication and provided her ice for her swelling leg. Anita's pain did not subside. Anita testified that she told Anna Pakelder, a registered nurse at Milbank Hospital, that the footrest had abruptly come down during her physical therapy session. She claimed that it caused her "breath-taking pain in her muscles on the right upper leg." Anita testified that RN Pakelder removed the geriatric chair from Anita's room and brought back a chair with a lever on the side.

[¶11.] Anita's pain continued throughout the evening and night of September 14. She received additional pain medication and Demerol injections in both legs. On September 15, Milbank Hospital x-rayed Anita's right leg. The x-ray showed

postsurgical changes to the right total hip arthroplasty, namely a fracture of Anita's right proximal femur. Anita was transported by ambulance to Prairie Lakes Hospital. Dr. Vener met with Anita that same day. Anita informed Dr. Vener about the popping noise she heard on September 11 and about the footrest on the chair collapsing on September 14. Dr. Vener testified that although Anita had informed him of the incident with the chair, he did not record that incident in his notes. He explained that he was more concerned about addressing Anita's fractured femur.

[¶12.] On September 16, Dr. Vener performed a revision femoral component right total hip arthroplasty and open reduction and internal fixation right periprosthetic fracture of the proximal femur. Anita remained at Prairie Lakes Hospital until September 20, 2014, when she was transferred to Jenkins Living Center for rehabilitation. She was discharged from Jenkins Living Center on October 25, 2014.

[¶13.] In January 2016, Anita and Marvin brought suit against Big Stone and Milbank Area Hospital. They alleged that Big Stone "failed to provide proper physical therapy and rehabilitation services to Anita Hanson[.]" They further claimed that both Big Stone and Milbank Area Hospital "failed to diagnose the fractured femur until September 15, 2014[.]" Anita averred that because of the negligence of both defendants, she was injured. Marvin claimed that as a result of the defendants' negligence, he "lost the aid, comfort, society, advice, companionship, and affection" of Anita for a period of time.

[¶14.]    The Hansons identified Jonathan Reynolds, a physical therapist and PhD, as an expert. They indicated that they "anticipated that Dr. Reynolds [would] testify regarding the care and treatment of Anita Hanson by Big Stone Therapies, Inc. and Milbank Area Hospital Avera; the use of the geriatric chair during Anita Hanson's physical therapy; and the therapists' alleged negligence." The Hansons reserved the right to supplement their expert witness designation.

[¶15.]    In his initial report, Dr. Reynolds opined that:

1. The physical therapy records of treatment rendered are brief, illegible in areas, and vague.

2. Patients should not sit in a chair that causes hip flexion greater than 90 degrees that results from the hips being lower than the knees. This would appear to have been the posture Ms. Hanson would have ended up in after her recliner suddenly closed.

3. Patients should sit in chairs with a straight back and with arm rests.

4. Transfers into and out of the chair should not result in flexion of the hips past 90 degrees.

5. Exercises for the lower extremities should not be performed in a recliner but rather on a bed.

Dr. Reynolds further opined that:

1. Ms. Hanson's injury and its mechanism should have been documented. No incident report was written.

2. The cause of the injury needs to be determined. The health professionals involved in Ms. Hanson's care aren't in agreement regarding the incident with the chair and its causal relationship with her femur fracture.

3. If the chair was in fact defective it should not have been used as a seat or as a surface on which to perform physical therapy exercises. The defect should have been communicated to other staff and the chair should have been removed from the room.

4. If the photographs are accurate in depicting a backwardly tilted seatpan that would result in positioning someone of

>Ms. Hanson's stature in a position of hips higher than knees, the Lumex chair should not have been used in her care for leisurely sitting or for performance of exercises.

[¶16.] On May 25, 2017, Milbank Area Hospital moved for summary judgment. It asserted that the Hansons failed to identify any negligent act by the Hospital or its agents. The Hospital further claimed that the Hansons were required to produce expert testimony to support their claim that Hospital staff failed to timely diagnose Anita's fracture and to support their claim that the Hospital's negligence, if any, proximately caused damage to Anita.

[¶17.] In June 2017, Big Stone also moved for summary judgment. Big Stone similarly asserted that summary judgment was proper because the Hansons did not produce sufficient expert testimony. According to Big Stone, the Hansons' expert— Dr. Reynolds—expressed no opinion within a reasonable degree of probability that Big Stone's physical therapists were negligent or that their alleged negligence caused Anita's femur to fracture.

[¶18.] In July 2017, the Hansons submitted an updated report by Dr. Reynolds. The updated report indicated that Dr. Reynolds had reviewed Anita's medical records and the depositions taken to date. Dr. Reynolds noted that PT Lightfield had testified that Anita did not have a fractured femur while she was in his care. He likewise noted that PT Pauli testified that Anita was not injured in any way during the physical therapy session on September 13. Although PT Batchelor testified that Anita was not injured in the September 14 physical therapy session, Dr. Reynolds found it "interesting" that PT Batchelor recalled certain features of the physical therapy session two and a half years after the session but

could not recall others. In particular, Dr. Reynolds noted that PT Batchelor did not document that the chair "had a clunk to it"; that Anita complained of muscle spasms; that Anita raised her voice because she had more muscle spasms; or that PT Batchelor had carefully lowered the footrest.

[¶19.]     Based on his professional education and experience and his review of the deposition testimony and Anita's medical records, Dr. Reynolds updated his opinion, concluding that:

1. Ms. Hanson was most likely to have suffered a fractured femur on her operative side sometime in the latter part of Sunday September 14, 2014.

2. The exact cause of the injury is still not clear, but it is at least highly probable that it occurred in the care of Ms. Batchelor during a therapy session on September 14, 2014 at which time Mr. and Mrs. Hanson testified that the injury occurred, and Ms. Batchelor testified to a marked increase in Ms. Hanson's symptoms related to the closure of the recliner which caused her to "raise her voice."

3. The chair appears to have been defective: Ms. Batchelor testified as to there being a "clunk" in the mechanism of the chair upon closure.

4. Treatment of a patient following a total hip arthroplasty (THA) in a recliner is disingenuous at best and negligent at worst, and places the patient at undue risk of injury in the event of the chair closing suddenly, possibly resulting in flexion of the hip past 90 degrees, a well-known risk for hip dislocation and possible femur fracture following THA surgery.

The defendants requested that the circuit court strike Dr. Reynolds's supplemental opinion as untimely and prejudicial. The circuit court did not specifically grant or deny the defendants' request but did consider Dr. Reynolds's opinion. We note that neither Big Stone nor the Hospital filed a notice of review on appeal challenging the circuit court's consideration of Dr. Reynolds's initial and supplemental opinion.

[¶20.]     In opposition to Big Stone's and the Hospital's respective motions for summary judgment, the Hansons maintained that expert testimony was not required because the issues presented related to matters of common experience and to matters of which a jury could determine without the assistance of an expert. Alternatively, the Hansons relied upon the expert opinion of Dr. Reynolds and claimed that he was qualified to testify about Big Stone's negligence. In regard to the Hospital's negligence, the Hansons asserted that a jury could infer, without expert testimony, that the Hospital had knowledge that Anita was injured on September 14, that it failed to diagnosis her fracture in a timely manner, and that the failure proximately caused Anita additional damage.

[¶21.]     The circuit court held a hearing on the defendants' respective motions. Thereafter, the court issued a letter decision, which it incorporated in its subsequent order granting Big Stone and the Hospital summary judgment. In its letter decision, the court indicated that although the Hansons brought suit for general negligence, the "instant case is a suit alleging medical malpractice[.]" The court, therefore, declared that the Hansons were required to support their claims with expert testimony. Specifically, the court concluded that expert testimony was required to establish "[t]he cause of Anita's broken leg, when and how it occurred, whether the treatment provided by Avera [the Hospital] breached any standards of appropriate care, if so, what should have been done and how Anita was damaged[.]" The court further found that Dr. Reynolds may have been qualified to opine on the care provided by the physical therapists, but he would not be "qualified to render a diagnosis pertaining to a broken leg or opine on how this injury occurred[.]"

[¶22.]     The Hansons appeal, asserting that the circuit court erred when it granted Big Stone and the Hospital summary judgment.

## Standard of Review

[¶23.]     On a review of a decision to grant or deny summary judgment, we "determine whether the moving party demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law." *Gades v. Meyer Modernizing Co.*, 2015 S.D. 42, ¶ 7, 865 N.W.2d 155, 157-58 (quoting *Peters v. Great W. Bank, Inc.*, 2015 S.D. 4, ¶ 5, 859 N.W.2d 618, 621). "Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Pete Lien & Sons, Inc. v. Zellmer*, 2015 S.D. 30, ¶ 10, 865 N.W.2d 451, 454 (quoting *Luther v. City of Winner*, 2004 S.D. 1, ¶ 6, 674 N.W.2d 339, 343).

## Analysis

### 1. Milbank Area Hospital

[¶24.]     The Hansons contend that the circuit court improperly granted summary judgment on their negligence claim against the Hospital. They assert that the Hospital was aware of the incident that occurred during the September 14 physical therapy session, and therefore, had a duty to more promptly x-ray her right leg and hip to determine what injuries, if any, Anita had suffered. They further contend that a jury could conclude, without the assistance of expert testimony, that

the Hospital's delay in diagnosing her fractured femur caused her to endure unnecessary pain and suffering.

[¶25.] "In order to prevail in a suit based on negligence, a plaintiff must prove duty, breach of that duty, proximate and factual causation, and actual injury." *Hamilton v. Sommers*, 2014 S.D. 76, ¶ 21, 855 N.W.2d 855, 861 (quoting *Bernie v. Catholic Diocese of Sioux Falls*, 2012 S.D. 63, ¶ 15, 821 N.W.2d 232, 240). The Hansons' complaint alleges professional negligence. They assert that the Hospital had a duty to provide professional medical services to Anita and that the Hospital breached that duty, which breach proximately caused Anita damage. In a suit for professional negligence, the plaintiff must prove that the professional deviated from the required standard of care. *Magbuhat v. Kovarik*, 382 N.W.2d 43, 46 (S.D. 1986); *accord Schrader v. Tjarks*, 522 N.W.2d 205, 210 (S.D. 1994).

[¶26.] The Hansons correctly identify that expert testimony is not always required to prove that a professional deviated from the required standard of care. *See Magbuhat*, 382 N.W.2d at 46. But in this case, the standard of care required of Hospital staff is not a subject "within the common knowledge and comprehension of persons possessed of ordinary education, experience and opportunity." *See id.* Indeed, laypersons would not generally know what type or manner of care medical staff should provide a patient in response to a report of increased pain following a physical therapy session for rehabilitation of a right total hip arthroplasty. Because laypersons would have to indulge in speculation and conjecture to determine whether the care provided to Anita by Hospital staff was appropriate, the Hansons were required to support their claim with expert testimony.

[¶27.] In response, the Hansons contend that they supported their claim with Dr. Reynolds's expert opinion. But Dr. Reynolds did not offer an expert opinion on the care provided to Anita by Hospital staff or on the standard of care required by Hospital staff in response to Anita's complaints of increased pain; nor is Dr. Reynolds qualified to offer such opinions. Because the Hansons did not "make a showing sufficient to establish the existence of an element essential" to their case and "on which [they] will bear the burden of proof at trial[,]" the circuit court correctly granted the Hospital summary judgment. *See Western Cons. Co-op. v. Pew*, 2011 S.D. 9, ¶ 19, 795 N.W.2d 390, 396 (quoting *De Smet Farm Mut'l Ins. Co. v. Gulbranson Dev. Co.*, 2010 S.D. 15, ¶ 16, 779 N.W.2d 148, 155).

## 2. Big Stone Therapies, Inc.

[¶28.] The Hansons next assert that the circuit court erred when it granted Big Stone summary judgment. The Hansons aver that they "produced a reliable expert opinion" to support their claim that PT Batchelor was negligent, which negligence injured Anita. In particular, they direct this Court to Dr. Reynolds's expert opinion that PT Batchelor's use of a geriatric chair fell below the requisite standard of care and caused Anita undue risk of being placed in a position of hip flexion past 90 degrees.

[¶29.] It is well settled that "[w]hen challenging a summary judgment, the nonmoving party must substantiate [their] allegations with sufficient probative evidence that would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy." *Peters*, 2015 S.D. 4, ¶ 13, 859 N.W.2d at 624 (quoting *Estate of Elliott v. A & B Welding Supply Co.*, 1999 S.D. 57, ¶ 16, 594 N.W.2d 707, 710).

We view all reasonable inferences drawn from the evidence in a light most favorable to the nonmoving party. *Estate of Elliott*, 1999 S.D. 57, ¶ 15, 594 N.W.2d at 709-10. Moreover, we resolve doubts against the moving party. *Gades*, 2015 S.D. 42, ¶ 7, 865 N.W.2d at 158.

[¶30.]     The Hansons brought suit against Big Stone for professional negligence arising out of physical therapy services. As we previously stated, in a suit for professional negligence, the plaintiff must establish duty, breach, and causation. *Hamilton*, 2014 S.D. 76, ¶ 21, 855 N.W.2d at 861. "Generally, expert testimony is required in negligence cases when the defendant is held to a standard of care that is outside the common knowledge and experience of ordinary persons." 65A C.J.S. Negligence § 930 (Updated March 2018); *accord Koeniguer v. Eckrich*, 422 N.W.2d 600, 601-02 (S.D. 1988); *Magbuhat*, 382 N.W.2d at 46.

[¶31.]     Here, the Hansons produced Dr. Reynolds's expert opinion on the required standard of care of a physical therapist in the performance of physical therapy services for a patient following a total hip arthroplasty. In particular, Dr. Reynolds opined that following a total hip arthroplasty, "[p]atients should sit in chairs with a straight back and with arm rests" and "[e]xercises for the lower extremities should not be performed in a recliner but rather on a bed." According to Dr. Reynolds, based on his education and experience, "[t]reatment of a patient following a total hip arthroplasty (THA) in a recliner is disingenuous at best and negligent at worst[.]" He opined that the use of a recliner for physical therapy after a THA, "places the patient at undue risk of injury in the event of the chair closing suddenly[.]" PTs Lightfield, Pauli, and Batchelor similarly testified that a patient

should not experience flexion of the hip past 90 degrees in physical therapy following a THA.

[¶32.]    Even so, Big Stone asserts that the Hansons failed to produce sufficient evidence to support their claim that Big Stone's therapists deviated from the required standard of care. We disagree. It is undisputed that PT Batchelor performed the physical therapy service for Anita in a recliner, not in a chair with a straight back with arm rests or on a bed. In support of his expert opinion that PT Batchelor deviated from the required standard of care when she used the geriatric chair during Anita's physical therapy session, Dr. Reynolds considered that the geriatric chair in Anita's room did not have a lever. According to Dr. Reynolds, without a lever to secure the chair's position, there existed a risk that the footrest would unintentionally move. PT Lightfield and PT Pauli also testified that a geriatric chair without a lever creates a risk that the footrest could move down unintentionally. PT Pauli also testified that "standard hip precautions" post-surgery include: "no sitting past 90 degrees, no crossing your legs, even at the ankle, and then no letting the whole leg turn inward." From our review, there is sufficient evidence in the record to create a material issue of fact concerning whether PT Batchelor deviated from the required standard of care when she performed Anita's physical therapy services.

[¶33.]    Nevertheless, Big Stone further claims that the circuit court properly granted summary judgment because the Hansons cannot as a matter of law establish causation absent expert testimony. Big Stone emphasizes that Dr. Reynolds is not a medical doctor or an orthopedic surgeon, and therefore, is not

competent to opine on the cause of Anita's fractured femur. Big Stone also highlights that Dr. Vener—Anita's surgeon—testified that he is unsure what caused Anita's femur to fracture.

[¶34.]     Long ago we said,

> In negligence cases and especially in malpractice cases, proof of causal connection must be something more than consistent with the plaintiff's theory of how the claimed injury was caused. The burden is on plaintiff to show that it is more probable that the harm resulted from some negligence for which defendant was responsible than in consequence of something for which he was not responsible.

*Lohr v. Watson*, 68 S.D. 298, 303, 2 N.W.2d 6, 8 (1942) (quoting *Yates v. Gamble*, 268 N.W. 670, 674 (Minn. 1936); *accord Koeniguer*, 422 N.W.2d at 601-02 (expert testimony is generally required to prove causation). "Causation is generally a question of fact for the jury except when there can be no difference of opinion in the interpretation of the facts." *Weiss v. Van Norman*, 1997 S.D. 40, ¶ 13, 562 N.W.2d 113, 116.

[¶35.]     In granting summary judgment, the circuit court held that Dr. Reynolds was not qualified to opine on causation "because such opinions would be outside his training and area of expertise." As the special concurrence identifies, the circuit court correctly ruled inadmissible Dr. Reynolds's opinion on causation. However, the Hansons have established "that it is more probable that the harm resulted from some negligence for which defendant was responsible than in consequence of something for which [s]he was not responsible." *See Lohr*, 68 S.D. at 303, 2 N.W.2d at 8.

[¶36.] Dr. Vener testified that he confirmed by x-ray that Anita did not have a fractured femur following her September 8 surgery. PT Lightfield and PT Pauli testified that Anita was able to perform her physical therapy exercises and was able to ambulate farther in each session after the surgery. They also testified that following their respective physical therapy sessions with Anita on September 12 and 13, Anita did not have a fractured femur and was not injured in any way during the physical therapy sessions. Anita testified that she did not experience a significant change in pain until after the physical therapy session with PT Batchelor on September 14. In particular, the Hansons produced the nursing staff notes documenting Anita's report that her pain was different or worse after the physical therapy session with PT Batchelor. It is undisputed that Anita's pain did not subside and Hospital staff took her for an x-ray the morning after the physical therapy session with PT Batchelor. The x-ray revealed that Anita's femur had fractured.

[¶37.] Further, Anita and Marvin testified that PTs Lightfield and Pauli placed a folding chair under the open footrest during the physical therapy sessions, which prevented the chair from abruptly and unexpectedly returning to an upright position. Anita testified that PT Batchelor did not place a chair under the open footrest during the physical therapy session. Marvin and Anita testified that instead, PT Batchelor forced the footrest down on the geriatric chair, which caused the chair to abruptly come to an upright position. According to Dr. Reynolds, if the chair closed in the manner testified to by Anita and Marvin, that action could have caused "flexion of the hip past 90 degrees, a well-known risk for hip dislocation and

possible femur fracture following THA surgery." Anita testified that after PT Batchelor forced the footrest down, her leg dropped quickly and she screamed in pain.

[¶38.] Summary judgment is appropriate "when the truth is clear" or issues are "shown to be a sham, frivolous or so unsubstantial" that it is obvious that it would be futile to try them. *Keystone Plaza Condominiums Ass'n v. Eastep*, 2004 S.D. 28, ¶ 15, 676 N.W.2d 842, 847 (quoting *St. Onge Livestock Co., Ltd. v. Curtis*, 2002 S.D. 102, ¶ 25, 650 N.W.2d 537, 544). Summary judgment "should not be granted unless the moving party has established the right to a judgment with such clarity as to leave no room for controversy." *Richards v. Lenz*, 539 N.W.2d 80, 83 (S.D. 1995) (quoting *Morgan v. Baldwin*, 450 N.W.2d 783, 785 (S.D. 1990)). "To surmise that a party will not prevail at trial is not a sufficient basis to grant summary judgment[.]" *Trapp v. Madera Pacific, Inc.*, 390 N.W.2d 558, 564 (S.D. 1986).

[¶39.] Although Big Stone presents contradictory evidence to support its claim that PT Batchelor did not deviate from the required standard of care and its claim that there was no causal connection between PT Batchelor's physical therapy service and Anita's injury, we view the evidence and reasonable inferences in a light most favorable to the Hansons. In that light, the evidence reveals that PT Batchelor deviated from the required standard of care when she caused flexion of Anita's hip past 90 degrees and that hip flexion past 90 degrees following hip surgery can injure a patient. Also, evidence supports that prior to Anita's physical therapy session with PT Batchelor, Anita was not injured. During the session on

September 14, Anita's leg dropped suddenly, and she experienced a sharp pain. After the session, Anita experienced a marked increase in pain and worsening of ambulation.

[¶40.] Thus, on this record, a jury could reasonably infer from the evidence, rather than from speculation or conjecture, that PT Batchelor's alleged negligence injured Anita. Further, a jury could reasonably conclude that Anita would not have been injured absent PT Batchelor's deviation from the standard of care during the physical therapy session. Because Big Stone has failed to demonstrate an absence of any genuine issue of material fact to show entitlement to judgment on the merits as a matter of law, the circuit court erred when it granted Big Stone summary judgment.

[¶41.] We affirm summary judgment in favor of Milbank Area Hospital Avera and reverse summary judgment entered in favor of Big Stone Therapies, Inc.

[¶42.] ZINTER and JENSEN, Justices, concur.

[¶43.] GILBERTSON, Chief Justice, and KONENKAMP, Retired Justice, concur specially.

[¶44.] KONENKAMP, Retired Justice, sitting for KERN, Justice, disqualified.

[¶45.] SALTER, Justice, not having been a member of the Court at the time this action was assigned to the Court, did not participate.

#28465

KONENKAMP, Retired Justice (concurring specially).

[¶46.]     In overturning the grant of summary judgment in favor of Big Stone Therapies, Inc., the circuit court ruled that Dr. Reynolds, a physical therapist, cannot "render a diagnosis pertaining to a broken leg or opine on how this injury occurred because such opinions would be outside his training and area of expertise." The circuit court concluded that Dr. Reynolds can only go so far as to render an opinion on the standard of care for physical therapists and the breach of that care. SDCL 19-19-702. And, it should be noted, unlike his opinions on the standard of care, Dr. Reynolds's causation opinion was not based on a tested methodology, subjected to peer review, and generally accepted in the medical community. *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 593-94, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). Thus, the circuit court was correct in ruling that Dr. Reynolds's opinion on causation was inadmissible.

[¶47.]     Nonetheless, our Court holds that the jury can *infer* the cause of plaintiff's fractured femur. In these particular circumstances, I agree. Ordinarily, expert testimony is required to prove every essential element, including causation. *Burley v. Kytec Innovative Sports Equip., Inc.*, 2007 S.D. 82, ¶ 28, 737 N.W.2d 397, 407. Our Court cites *Magbuhat v. Kovarik*, 382 N.W.2d 43, 46 (S.D. 1986) for the proposition that expert testimony is not always required to establish *negligence.* But the question here is whether medical expert testimony can be dispensed with to prove *causation.* In the medical malpractice setting, South Dakota has a scarcity of authority on this question. *See Koeniguer v. Eckrich*, 422 N.W.2d 601 (S.D. 1988).

-19-

[¶48.]     This is not a case in which Anita Hanson's injury was so obvious as to be irrefutable. Her fractured femur was not observable at the time of the accident. Neither is this a case that must rely on medical theories that a jury would not understand without expert assistance. In similar circumstances, other jurisdictions have ruled that expert testimony is not required to prove causation. Immediate outward manifestation of symptoms that naturally follow from an accident constitute the usual grounds for holding expert opinion unnecessary. *E.g., Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1210 (8th Cir. 2000). "[T]he causal relationship between [plaintiff's] fall and her immediate symptoms in the ankle, knee and back (the pain, swelling, and the inability to sit, stand or walk without assistance) is within the usual and ordinary experience of the average person." *Dodge-Farrar v. Am. Cleaning Servs. Co.*, 54 P.3d 954, 959 (Idaho Ct. App. 2002); *Brown v. Baker*, 672 N.E.2d 69, 71 (Ill. Ct. App. 1996) ("[I]f a plaintiff suffers a cut in an accident, the jury can readily determine without expert testimony that the accident caused the cut."). Medical opinion on causation of physical injury is unnecessary "only if the cause and effect are so immediate, direct and natural to common experience as to obviate any need for an expert medical opinion." *Weaver v. W.C.A.B. (Pa. Power Co.)*, 487 A.2d 116, 118 (Pa. Comm. 1985). On the other hand, when symptoms are more separated in time from the accident, the causal relationship becomes more tenuous, necessitating expert testimony to prove causation. *Dodge-Farrar*, 54 P.3d at 958.

[¶49.]     Other courts have acknowledged that broken bone cases are particularly amenable to lay opinion on causation because the experience is so

common. For example, in the case of *Pitts v. Wingate at Brighton, Inc.*, 972 N.E.2d 74 (Mass. App. Ct. 2012), the plaintiff, a nursing home patient, was being transferred from the toilet back to her bed by a staff member when she missed the wheelchair and fell. The plaintiff was "on the floor with her leg bent in front of her and her feet pushed up against the wall . . . holding on to the toilet and a bar on the wall so she would not fall further backwards and bang her head." *Id.* at 77. After being helped back into the wheelchair and "as she was being wheeled back to her bed, the plaintiff began pointing to her leg and complaining of pain there. She had made no such complaints prior to this time." *Id.* Expert opinion was offered to prove that the nursing home staff had been negligent. But even though the nursing home had an orthopedic surgeon's opinion that the fall did not cause the plaintiff's broken leg, the court ruled that such an opinion would not preclude the plaintiff's opposing nonexpert opinion because "[n]o expert testimony is necessary for lay jurors to appreciate that allowing a nursing home patient to fall to the floor could cause a broken bone." *Id.* at 79.

[¶50.]    Here, Anita Hanson suffered an immediate outward manifestation of symptoms that naturally followed from the accident. Beforehand, her pain was under control and her therapy sessions were progressing well. When the footrest shut abruptly, "Anita screamed out in pain." When the pain persisted, an x-ray the next morning revealed the fracture. Although a medical expert might refute her opinion on how her fracture occurred, she is nonetheless entitled to offer her lay opinion on its cause.

[¶51.]    GILBERTSON, Chief Justice, joins this special writing.